UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 1 2 2016

Kenneth Joseph, et al.,

                Plaintiffs,

--v--

Gnutti Carlo S.p.A., et al.,

                Defendants.

15-cv-8910 (AJN)

MEMORANDUM & ORDER

ALISON J. NATHAN, District Judge:

Plaintiffs Kenneth Joseph, KWD, Inc., and Bradonbay, Ltd. bring this suit against Defendants Gnutti Carlo S.p.A and WH Industries Delaware, Inc. (doing business as Gnutti Carlo USA, Inc.) claiming that Defendants breached certain obligations under a stock purchase agreement and a settlement agreement. Defendants have moved to dismiss two of the claims in Plaintiffs' complaint—one relating to Plaintiffs' alleged entitlement to a refund of value added tax ("VAT") paid to the United Kingdom ("UK") taxing authority, and the other for breach of the covenant of good faith and fair dealing. For the reasons that follow, Defendants' motion to dismiss is granted in part and denied in part.

I.    BACKGROUND

    A.    **Factual Background**[1]

Kenneth Joseph is the sole owner of KWD, Inc., a New York corporation. Compl., Ex. A at 1-2, Dkt. No. 1-1. In December 2012, Joseph and KWD reached an agreement to sell WH Industries Delaware, Inc. ("WH"), an entity that was wholly owned by KWD, to Gnutti Carlo

---

[1] For the purpose of resolving Defendants' motion to dismiss, the Court accepts all well-pleaded facts in the complaint as true, and draws all reasonable inferences in Plaintiffs' favor. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

1

S.p.A. ("Gnutti"), an Italian corporation. Compl. ¶¶ 1, 6, 10, Dkt. No. 1; *id.*, Ex. A at 1. Under the terms of a Stock Purchase Agreement (the "SPA"), Gnutti agreed to buy WH for $30.5 million. Compl. ¶ 10. The sale resulted in the creation of a new entity, which now does business as Gnutti Carlo USA. *Id.* at 1, ¶ 11.

Section 2.2(b) of the SPA provides that, after the sale, the parties would continue to negotiate "post-closing working capital adjustments." *Id.* ¶ 12; *see also id.*, Ex. A ("SPA") at 16. Specifically, Gnutti was to prepare several "Schedules," including a "Final Working Capital and Unpaid Transaction Expenses Schedule," within 90 days of closing, and Joseph, who served as the "guarantor" for the deal, was to have 45 days to object. SPA at 1, 16. The parties commenced a series of negotiations over the Schedules, including over adjustments to certain VAT liabilities. Compl. ¶ 13. The parties exchanged correspondences, often with attached spreadsheets, disputing various aspects of the post-closing adjustments. On March 20, 2013, Gnutti's CFO sent a summary of the proposed adjustments, which included a section on "VAT" and listed adjustments relating to, *inter alia*, German VAT and UK VAT. *Id.* Ex. C at 2, 6 of 7, Dkt. No. 1-3. On May 2, 2013, counsel for KWD sent a spreadsheet with purported errors in the Schedules, including adjustments relating to VAT. Compl. ¶¶ 15-16.

While the parties were negotiating these post-closing adjustments, they discovered an outstanding VAT liability that Gnutti owed to the UK. *Id.* ¶ 19. Specifically, Gnutti owed approximately £507,754 in UK VAT, while Plaintiff Bradonbay, a UK corporation, was entitled to a credit in the identical amount. *Id.* ¶¶ 4, 19. According to Defendants—and not disputed by Plaintiffs—this amount (the "UK VAT Amount") was the result of an error on Bradonbay's part. Bradonbay, which was owned by KWD, provided assembly services to WH in the UK. SPA at 2; Defs. Br. 3.[2] Pursuant to UK rules that used to be in effect, Bradonbay charged UK VAT on those services. Defs. Br. 3. Charging UK VAT to WH, a Delaware corporation, created a circular flow of money: WH would pay Bradonbay the VAT, Bradonbay would remit the VAT

---

[2] The Court uses "Defs. Br.," "Opp. Br.," and "Reply Br." to cite the briefing on Defendants' motion to dismiss. *See* Dkt. Nos. 19, 23, 24.

2

to HM Revenue & Customs ("HMRC"—the UK taxing authority), and WH would then reclaim that same VAT from HMRC. *Id.* At the beginning of 2010, however, the UK changed its VAT policy to avoid this circularity. *See id.* Under the new rules, Bradonbay should no longer have charged VAT to customers located outside the UK (like WH), and those customers should not have needed to reclaim that VAT. *Id.* But from January 1, 2010 to January 31, 2013, Bradonbay mistakenly continued to charge VAT to WH and, for a short time, to Gnutti Carlo USA (WH's successor). *Id.* WH and Gnutti Carlo USA therefore mistakenly continued to reclaim that same VAT from HMRC. *Id.* at 3-4. After discovering this error, KWD proposed addressing it through an accounting reconciliation with HMRC. Compl. ¶ 21. By updating the parties' VAT accounts internally, the parties could avoid the normal mechanism for correcting the error, which would require KWD to seek the UK VAT Amount as a refund from HMRC and Gnutti to pay that same amount to HMRC.[3] *Id.* ¶¶ 21-22. This proposal was not accepted by HMRC. *Id.* ¶ 23.

After the parties submitted this proposal regarding the UK VAT Amount to HMRC, they continued to negotiate the resolution of the post-closing working capital adjustments. *Id.* ¶ 24. Plaintiffs maintain that those negotiations encompassed "the issues surrounding the UK VAT Amount," *id.*, whereas Defendants contend that the UK VAT Amount was not a part of those negotiations because the parties had agreed to attempt to resolve it through the proposal to HMRC, Defs. Br. 6-7.

On October 23, 2013, all of the parties except Bradonbay executed an agreement (the "Settlement Agreement") that reflected the parties' desire to resolve "all outstanding . . . claims, matters or potential claims relating to the Schedules," i.e., the "Estimated Working Capital and Unpaid Transaction Expenses Schedule, the Final Working Capital and Unpaid Transaction Expenses Schedule and the Companies' Debt Schedule." Compl. ¶¶ 29-30; *id.* Ex. D ("Settlement Agreement") at 1, Dkt. No. 1-4. A copy of the Schedules was attached to the

---

[3] As Defendants note, the normal mechanism for resolving this error would also require KWD to pay Gnutti the refund it received from HMRC. Defs. Br. 5. In other words, even though KWD would be receiving a "refund" and Gnutti would be making a VAT payment, both parties would break even because KWD would have to transfer its refund to Gnutti.

3

agreement and incorporated by reference. Settlement Agreement at 1, 6. Pursuant to a release provision contained in the Settlement Agreement, Defendants released "all actions, causes of action, claims, demands, [or] damages . . . which are based upon any thing . . . which may exist by reason of, in relation to, pursuant to or in connection with [the Schedules]." Compl. ¶ 32 (fourth alteration in original). The Settlement Agreement does not mention the UK VAT Amount, *id.* ¶ 35, nor do the Schedules themselves, which are attached to the agreement as Exhibit C, *see* Chmil Decl., Ex. D at 13-27 of 27, Dkt. No. 20-4.[4]

After the parties executed the Settlement Agreement, Plaintiffs contacted HMRC to request that the UK VAT Amount be refunded to them. Compl. ¶ 37. Shortly thereafter, Defendants initiated a suit in this district claiming that Plaintiffs fraudulently induced to them to enter the Settlement Agreement. *Id.* ¶¶ 38-39. Specifically, Defendants argued that Plaintiffs failed to disclose their intent to retain the UK VAT Amount, and that such a failure constituted fraudulent inducement. *Id.* ¶ 39. In March 2014, approximately four months after filing their suit, Defendants filed a notice of voluntary dismissal. *Id.* ¶¶ 41-22. In the wake of Defendants' decision to dismiss their suit, Plaintiffs renewed their attempt to obtain a refund of the UK VAT Amount from HMRC. *Id.* ¶ 43. HMRC refused to issue a refund, finding that giving Plaintiffs a refund would unjustly enrich them at the expense of Defendants. *Id.* ¶¶ 45-46.

Plaintiffs appealed the HMRC decision, arguing, *inter alia*, that the Settlement Agreement resolved all liabilities between the parties, including any claim Defendants had to the UK VAT Amount. *Id.* HMRC filed an application to add Defendants as a party to the appeal. *Id.* ¶ 47. As part of that application, HRMC noted that Defendants had sent a letter on June 19, 2014, arguing that Bradonbay was not entitled to the UK VAT Amount and threatening suit against HMRC if it refunded the UK VAT Amount to Bradonbay. *Id.* ¶¶ 49-50. Defendants

---

[4] Although Plaintiffs attached the text of the Settlement Agreement to their complaint, they did not attach Exhibit C of the Settlement Agreement, which includes the Schedules. Defendants have attached a copy of the Settlement Agreement that includes the Schedules, and the Court may consider this more complete version of the Settlement Agreement. *See Licorish-Davis v. Mitchell*, No. 12-CV-601 (ER), 2013 WL 2217491, at *2 n.4 (S.D.N.Y. May 20, 2013). Plaintiffs do not object to Defendants' suggestion that the Court may consider the Schedules in resolving Defendants' motion to dismiss. *See* Defs. Br. 7 n.12.

4

consented to being added to the UK appeal, and the First-Tier Tribunal Tax Chamber—the court overseeing the case—granted HMRC's application on May 27, 2015. *Id.* ¶ 51. On October 15, 2015, Defendants filed a Statement of Position in the UK appeal, which argued that the UK VAT Amount was not one of the post-closing adjustments covered by the Settlement Agreement. *Id.* ¶¶ 52-54.

According to Plaintiffs, the UK appeal was stayed after Plaintiffs filed their complaint to allow this Court to determine the rights and obligations of the parties under the Settlement Agreement. Opp. Br. 3.

### B.    Procedural History

Plaintiffs commenced this suit on November 12, 2015. Compl. at 13. Their complaint alleges four causes of action. First, Plaintiffs bring a breach-of-contract claim stemming from Defendants' alleged efforts to recoup the UK VAT Amount in the UK appeal. *Id.* ¶¶ 67-72. Plaintiffs' second and third causes of action relate to certain payments that Defendants were allegedly required to make under the Settlement Agreement. *Id.* ¶¶ 73-79. Fourth, Plaintiffs claim that Defendants breached the covenant of good faith and fair dealing. *Id.* ¶¶ 80-82.

On January 6, 2016, Defendants filed a motion to dismiss Counts One and Four of the Complaint. Dkt. No. 18. Defendants subsequently filed an answer, along, with six counterclaims, and Plaintiffs moved to dismiss all six counterclaims. *See* Dkt. Nos. 35, 36. The Court administratively denied Plaintiffs' motion on August 22, 2016, in light of the fact that, pursuant to a July 28, 2016 stipulation between the parties, Defendants filed an amended answer that did not include any counterclaims. Dkt. No. 65; *see also* Dkt. Nos. 57, 62. Pursuant to that same stipulation, Plaintiffs voluntarily dismissed Counts Two and Three of their complaint. Dkt. No. 57. Accordingly, the only causes of action remaining in the case are Counts One and Four of Plaintiffs' complaint, both of which are the subject of the instant motion to dismiss.[5]

---

[5] Plaintiffs also have requested attorneys' fees and costs stemming from their defense of Defendants' now-abandoned counterclaims. Dkt. No. 63. As the Court explained in its August 22, 2016 order, however, the Court will consider requests for fees and costs at the conclusion of this action. Dkt. No. 65.

## II.  LEGAL STANDARD

Defendants' motion to dismiss is brought pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (some internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

A court evaluating a motion under Rule 12(b)(6) must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks and citation omitted). The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The Court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## III.  DISCUSSION

Defendants have moved to dismiss Counts One and Four of Plaintiffs' complaint. They argue that Count One should be dismissed because the Settlement Agreement does not address

the UK VAT Amount, and they contend that Count Four must be dismissed because it is duplicative of the breach-of-contract claim. The Court considers each issue in turn.

### A. Plaintiffs Have Plausibly Alleged a Breach-of-Contract Claim with Respect to the UK VAT Amount

Count One of Plaintiffs' complaint alleges that the UK VAT Amount was one of the post-closing working capital adjustments that the parties resolved through the Settlement Agreement. Compl. ¶¶ 68-69. Accordingly, Plaintiffs contend that Defendants relinquished any claim they had to the UK VAT Amount when they executed the Settlement Agreement and that Defendants' efforts to intervene in the UK appeal, to prevent Plaintiffs from claiming the UK VAT amount, were thus a breach of contract. Defendants argue that this claim rests on an unenforceable "extra-contractual understanding." Defs. Br. 10-11. The Court disagrees. For the reasons that follow, the Court holds that the Settlement Agreement is ambiguous with respect to whether Defendants released any claim to the UK VAT Amount, and that Plaintiffs have therefore plausibly alleged a breach of contract.

Under New York law,[6] "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation marks and citation omitted). When interpreting a contract, "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks, citation, and alteration omitted). A contract that is "complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). But if a contract is ambiguous, then "extrinsic evidence may be considered to ascertain the correct and intended meaning of a term or terms." *Eternity Glob.*

---

[6] The Settlement Agreement provides that "[t]his Agreement shall be governed by, and construed in accordance with," New York law. Settlement Agreement at 7. The parties agree that New York law applies. *See* Defs. Br. 11 n.13; Opp. Br. 4.

*Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177-78 (2d Cir. 2004) (internal quotation marks and citation omitted). "An ambiguity exists" when a contract's terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks and citation omitted).

  The parties acknowledge that the key question of contract interpretation here is whether the Settlement Agreement encompasses the UK VAT Amount. *See* Opp. Br. 3; Reply Br. 2. As Defendants note, the Settlement Agreement is "a fully integrated contract with a merger clause." Defs. Br. 11; *see also* Settlement Agreement at 6 ("This Agreement, and the Exhibits attached hereto and incorporated herein by reference, represent the entire understanding and agreement between the parties with respect to the subject matter hereof."). In light of that fact, Defendants argue that the Settlement Agreement cannot encompass the UK VAT Amount because there are "*no* terms regarding the UK VAT Amount in the Settlement," and there are no ambiguous terms that *could* encompass the UK VAT Amount. Reply Br. 4 (emphasis in original). Defendants are mistaken. Although the Settlement Agreement does not expressly mention the UK VAT Amount, it is ambiguous whether the release provision contained in the agreement relinquishes Defendants' claim to the UK VAT Amount.

  The release provision of the Settlement Agreement provides, in relevant part, that Defendants release any "causes of action, claims, [or] demands" that they could assert against Plaintiffs that "are based upon any thing . . . which may exist by reason of, in relation to, pursuant to or in connection with . . . the Schedules." Settlement Agreement at 5. It is unclear from this provision what it means for a claim to exist "in relation to" or "in connection with" the Schedules. Other clauses from the Settlement Agreement do not add clarity. For instance, clauses in the "Recitals" section of the agreement explain that the parties "desire to settle all amounts due . . . arising *with respect to* the Schedules" and that the parties "have negotiated a

8

complete resolution of . . . all outstanding . . . claims, matters or potential claims *relating to* the Schedules." Settlement Agreement at 1 (emphases added). Nothing in the Settlement Agreement offers guidance as to when a claim "relates" to the Schedules. While a claim unambiguously must have *some* connection to the Schedules in order to fall within the terms of the Settlement Agreement, it is unclear from the face of the agreement what kind of connection would suffice.

The next question is therefore whether the UK VAT Amount plausibly has some connection to the Schedules. The Schedules, as defined in the Settlement Agreement, are the Estimated Working Capital and Unpaid Transaction Expenses Schedule, the Final Working Capital and Unpaid Transaction Expenses Schedule, and the Companies' Debt Schedule. Settlement Agreement at 1. The second of those schedules—the Final Working Capital and Unpaid Transaction Expenses Schedule (the "Final Schedule")—illustrates why there is ambiguity as to whether Defendants have released their claim to the UK VAT Amount. The Final Schedule is one of the documents that Gnutti had to produce, pursuant to § 2.2(b) of the SPA, within 90 days of closing the purchase of WH. SPA at 16. The SPA does not define, with specificity, which kinds of assets and liabilities should be included in the Final Schedule. But the SPA does acknowledge that there could be disputes with respect to the Final Schedule and outlines a process for resolving such disputes. *Id.* The Settlement Agreement indicates that "under Section[] 2.2(b) . . . of the Purchase Agreement, a dispute has arisen with respect to . . . the Final Working Capital and Unpaid Transaction Expenses Schedule" and that a copy of the Final Schedule is attached to the agreement as Exhibit C. Settlement Agreement at 1. Turning to Exhibit C, there is a spreadsheet with the title "Final Working Capital and Unpaid Expenses Schedule." Chmil Decl., Ex. D at 25 of 27. The spreadsheet lists the estimated and final values of various assets and liabilities, and it provides the resulting estimated and final determinations of working capital. *Id.* But the entries in the spreadsheet for assets and liabilities are not very specific. For instance, the only "Current Liabilities" with values listed in the spreadsheet are "Accounts Payable" and "Accrued Expenses & *Other Current Liabilities*." *Id.* (emphasis

9

added). These are ambiguous terms, particularly "Other Current Liabilities," which on its face could plausibly cover tax liabilities like the UK VAT Amount.

Defendants do not cite, and the Court has not found, a provision of the Schedules, the Settlement Agreement, or the SPA that makes clear what liabilities are included in the Final Schedule. Accordingly, "a reasonably intelligent person who has examined the context of the entire integrated agreement" would be uncertain as to the scope of the Final Schedule. *Morgan Stanley*, 225 F.3d at 275. Similarly, a reasonably intelligent person would not know which claims *relate* to the Final Schedule, given the ambiguity in both the Settlement Agreement's release provision and the Final Schedule itself.

In light of these ambiguities, Plaintiffs plausibly allege that the UK VAT Amount is encompassed by the Settlement Agreement. Plaintiffs claim that VAT liabilities were among the issues "delineated in the Final Working Capital and Unpaid Transaction Schedule." Compl. ¶ 13. They further claim that "negotiations regarding the post-working capital adjustments encompassed various adjustments relating to VAT—including UK VAT," and that "[b]oth parties considered . . . the UK VAT Amount[] to be [a] post-closing working capital adjustment[]." *Id.* ¶¶ 35, 69. Finally, they allege that the Settlement Agreement resolved "all of the post-closing working capital adjustments . . . includ[ing] *all* of the outstanding VAT adjustments." *Id.* ¶ 26 (emphasis added). From these allegations, there is sufficient factual content to "allow[] the court to draw the reasonable inference" that the UK VAT Amount was encompassed by the Settlement Agreement and that Defendants therefore breached the agreement by contesting Plaintiffs' claim to the UK VAT Amount in the UK appeal. *Ashcroft*, 556 U.S. at 678.

Defendants offer two arguments against this reading of the complaint and the attached documents. First, they emphasize that the UK VAT Amount is not referenced anywhere in the Settlement Agreement. *See* Defs. Br. 10-12. In Defendants' view, if the UK VAT Amount is not mentioned in the Settlement Agreement, then the only way Defendants could have released their claim to that amount is through an extra-contractual understanding. *Id.* at 10-11. Such

10

understandings are, as Defendants note, unenforceable. *See, e.g., Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 269 (S.D.N.Y. 2000) (noting that "claims based on prior understandings that contradict the plain terms of the written contract are barred"). But Defendants' argument elides the distinction between something that is not *expressly* mentioned in the Settlement Agreement and something that is not *encompassed* by the agreement. As the Court has already explained, the Settlement Agreement and the Schedules use ambiguous language to describe the post-closing working capital adjustments that are resolved by the agreement. And as best the Court can tell, none of the particular liabilities that were the subject of the parties' negotiations surrounding the post-closing working capital adjustments are *expressly* mentioned in the Settlement Agreement or the attached Schedules. Rather, "Accrued Expenses & Other Current Liabilities" is as specific as those documents get. This does not mean that a particular liability is not encompassed by the Settlement Agreement; it just means the parties chose to memorialize their agreement at a higher level of generality.[7] The Court does not need to "disregard the plain language of the Settlement Agreement" to conclude that the agreement potentially encompasses the UK VAT Amount. Reply Br. 4. It just needs to decide, as it has, that the Settlement Agreement's language is ambiguous and that the UK VAT Amount could be one of the various post-closing adjustments resolved by the agreement.

Defendants' second argument, in a footnote, is that even if the Settlement Agreement potentially encompassed the UK VAT Amount, various documents attached to the complaint or incorporated by reference make clear that the parties did not intend to resolve the UK VAT Amount through the Settlement Agreement. Defs. Br. 12 n.14. Rather, Defendants argue, the documents show that the parties intended to resolve the UK VAT Amount issue through the accounting proposal to HMRC. *Id.* This argument is meritless at the motion to dismiss stage.

---

[7] Although the Court cannot look to extrinsic evidence to decide whether the Settlement Agreement is ambiguous, it is telling that many of the specific assets and liabilities that the parties appear to agree were part of the post-closing adjustment negotiations are not listed expressly in the Schedules or the Settlement Agreement. *See, e.g.*, Compl. Ex. C at 5-6 of 7 (listing "accrued liabilities," like "Alabama wages until 28th," and "VAT" amounts, such as "German VAT until October" and "UK VAT receivables"); *see also* Defs. Br. 5 (citing Ex. C of the complaint as evidence that the parties "were negotiating post-closing adjustments to the SPA").

11

As Defendants implicitly acknowledge by citing to *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004), courts will only decline to accept as true the allegations in a complaint when those allegations are "*contradicted* either by statements in the Complaint itself or by documents upon which its pleadings rely." *Id.* at 566 (emphasis added). Applying that rule, the court in *Bristol-Myers Squibb* rejected an allegation about consignment sales as "inconsistent with the documents upon which the Complaint is based" because the record revealed that "the sales at issue were not within the traditional (and undisputed) definition of consignment sales." *Id.* No such contradiction is present here. None of the documents cited by Defendants state that the parties intended to exclude the UK VAT Amount from the release provision in the Settlement Agreement. Instead, the documents depict a version of events that may or may not be consistent with Defendants' account. For instance, while some documents show that there were negotiations over the Schedules that did not mention the UK VAT Amount, those documents do not preclude the possibility that the UK VAT Amount was only mentioned in later negotiations. *See e.g.*, Compl., Exs. B, C (communications and spreadsheets relating to post-closing adjustments). Similarly, the documents that describe the parties' efforts to resolve the dispute over the UK VAT Amount directly with HMRC do not foreclose the possibility that the parties ultimately decided to include the UK VAT Amount in the post-closing working capital adjustments. *See, e.g.*, Compl., Ex. G (HMRC's Notice of Application regarding the UK appeal). Whatever weight these documents may eventually carry in this litigation, they do not require the Court to reject the allegations in Plaintiffs' complaint on a motion to dismiss.

Because the release provision of the Settlement Agreement is ambiguous, and because the Court must accept Plaintiffs' well-pleaded factual allegations as true, it is plausible that Defendants released their claim to the UK VAT Amount through the Settlement Agreement. Accordingly, Defendants' motion to dismiss Count One of the complaint is denied.

**B.  Plaintiffs Have Not Adequately Pled a Claim for Breach of the Covenant of Good Faith and Fair Dealing**

Defendants also move to dismiss Plaintiffs' fourth cause of action, which alleges that Defendants breached the covenant of good faith and fair dealing. Defendants advance two arguments in favor of dismissal: first, that Plaintiffs cannot use a claim for breach of the implied covenant of good faith to circumvent a failed claim for breach of contract relating to the UK VAT Amount; and second, that the breach of the implied covenant claim is duplicative of the breach of contract claim alleged in Count One of the complaint.[8] Defendants' first argument is irrelevant in light of the Court's holding that the breach of contract claim relating to the UK VAT Amount survives the motion to dismiss. But the Court agrees that Plaintiffs have failed to allege facts that go beyond their claim for breach of contract, and the claim for breach of the implied covenant must therefore be dismissed as duplicative.

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (internal quotation marks and citation omitted). Accordingly, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Courts in this circuit consistently dismiss claims for breach of the implied covenant of good faith on these grounds. *See, e.g., Boart Longyear Ltd. v. All. Indus., Inc.*, 869 F. Supp. 2d 407, 416 (S.D.N.Y. 2012) (dismissing claim for beach of the implied covenant as "redundant" because it was "based on the same factual elements" as a breach of contract claim); *Spread Enterprises, Inc. v. First Data Merch. Servs. Corp.*, No. 11-CV-4743 (ADS), 2012 WL 3679319, at *5 (E.D.N.Y. Aug. 22, 2012) (noting that although plaintiffs may usually plead inconsistent claims in the alternative, "in the context of a claim for breach of the covenant of good faith and fair dealing, claims are not in the alternative when they are based on the exact same allegations" (internal quotation marks omitted)). In order

---

[8] The Court notes that, in the stipulation dismissing Counts Two and Three, Plaintiffs withdrew allegations that had previously served as a predicate for Count Four. *See* Dkt. No. 57.

for Plaintiffs "to assert a cause of action for the breach of good faith and fair dealing that is not duplicative of [their] breach of contract claim," Plaintiffs must allege that Defendants "fulfilled [their] contractual obligations" but that those obligations were carried out "in bad faith in order to deprive Plaintiffs of the benefit of their bargain." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 333-34 (S.D.N.Y. 2010). Put differently, Plaintiffs must allege that Defendants "in bad faith, engaged in acts that had the effect of destroying or injuring plaintiffs' right to receive 'the fruits of the contract.'" *Demetre v. HMS Holdings Corp.*, 7 N.Y.S.3d 110, 112 (N.Y. App. Div. 2015).

Plaintiffs do not make such allegations. Rather, in their complaint, Plaintiffs rely entirely on the factual allegations supporting their breach of contract claim in alleging a breach of the implied covenant of good faith and fair dealing. Count Four alleges that the "above-described conduct," i.e., the same conduct that allegedly constitutes a breach of the Settlement Agreement and the SPA, "is inconsistent with [Defendants'] promises and obligations under the SPA and the Settlement Agreement." Compl. ¶ 81. There are no allegations that pertain to any efforts to deny Plaintiffs the benefit of either agreement. With respect to the specific issue of the UK VAT Amount, the only basis Plaintiffs put forward for their entitlement to that amount is that Defendants released their claim to the UK VAT Amount in the Settlement Agreement. In other words, Plaintiffs allege that Defendants breached the Settlement Agreement by pursuing a released claim; they do not allege that Defendants *fulfilled* their contractual obligations but nonetheless attempted to deprive Plaintiffs of the benefits of the Settlement Agreement. *See Serdarevic*, 760 F. Supp. 2d at 333-34.

Plaintiffs cursorily argue that they could prevail on Count Four if "Defendants intervened in [the UK appeal] in bad faith in order to deprive Plaintiffs of the amounts bargained for under the Settlement Agreement." Opp. Br. 8 (internal quotation marks omitted). But again, if the UK VAT Amount actually *was* an amount that Plaintiffs "bargained for under the Settlement Agreement," then Defendants' attempt to recoup it was a breach of the express terms of the Settlement Agreement, and not a breach of the implied covenant. If the UK VAT Amount was

14

*not* bargained for in the Settlement Agreement, then Plaintiffs have failed to explain why they are nonetheless entitled to it. Plaintiffs have thus failed to allege how Defendants' efforts to recoup the UK VAT Amount "had the effect of destroying or injuring plaintiffs' right to receive 'the fruits of the contract.'" *Demetre*, 7 N.Y.S.3d at 112. Accordingly, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing should be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss Count One of the Complaint but GRANTS their motion to dismiss Count Four. This resolve Docket No. 18.

SO ORDERED.

Dated: September 12, 2016
       New York, New York

_____
ALISON J. NATHAN
United States District Judge